# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | | |
|---|---|---|
| KELSEY RENEE WEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 13-3237-CV-S-DGK |
| | ) | |
| GARY DON BRANKEL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Rhonda West ("West") was walking down the road in Waynesville, Missouri, one winter night when she was struck by a passing vehicle. West died that night from her injuries, the victim of a hit-and-run that has never been officially solved. Over time, West's family came to believe that the driver who stuck and killed her was Defendant Gary Don Brankel ("Brankel"), an on-duty officer with the Waynesville Police Department—the same agency charged with investigating her death. The family believed that Brankel and certain other officers acted to cover up Brankel's involvement and impede a proper investigation. Eventually, another Waynesville Police Department officer agreed and filed a probable cause statement against Brankel for involuntary manslaughter and for tampering with evidence. But by the time the Police Department began seriously questioning Brankel's culpability, the limitations period had run for West's family to bring a wrongful death lawsuit against him.

West's daughter, Plaintiff Kelsey Renee West, brings this action under 42 U.S.C. § 1983 against the City of Waynesville ("the City"), Brankel, and three other police officers, Brandon Robertson ("Robertson"), Robert Allen Carter ("Carter"), and Clarence Henry Liberty ("Liberty"). Plaintiff alleges Defendants conspired to conceal Brankel's involvement in West's

death until Plaintiff could no longer bring a viable wrongful death claim, thereby vitiating her constitutional right to access the courts.

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. 63). For the reasons below, the motion is GRANTED IN PART and DENIED IN PART. Summary judgment is granted to the City and Robertson, but denied to Brankel, Carter, and Liberty.

## Background[1]

On the evening of January 31, 2010, a 911 dispatcher in Pulaski County, Missouri, received a call that a burglary was in progress at an unoccupied home in Waynesville. Sheriff's deputies responded to the scene and encountered several cars parked outside the house. Fearing that a large number of perpetrators were inside, the deputies requested assistance from the Waynesville Police Department.

The dispatcher sent Brankel and Robertson, two on-duty officers with the Waynesville Police Department. Brankel traveled separately in his service vehicle, which was a white Ford Expedition sports utility vehicle with internal, but not external, emergency lights. The county communications center asked Brankel and Robertson to "expedite" their arrival. At 10:24 p.m. Brankel activated his emergency lights and departed for the scene.

Brankel drove northbound on Highway 17, which had no functional shoulder. At 10:26 p.m., he contacted the communications center to report a woman walking down the middle of the road. He asked for another agency to check on her, and proceeded toward the burglary in progress.

---

[1] The parties vigorously contest which facts are relevant and what inferences from those facts are reasonable. This section omits facts properly controverted by Plaintiff, facts that are immaterial to the resolution of the pending motion, facts that are not properly supported by admissible evidence, legal conclusions, and argument presented as fact. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). Although a jury could make completely opposite inferences from these facts, the Court must here state the facts in the light most favorable to Plaintiff as the non-moving party. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

The distance between where Brankel saw the woman and the site of the burglary is 1.9 miles. Brankel told his dispatcher at 10:30 p.m. that he had arrived at the house, but he may not have actually arrived until 10:34 p.m., when he began calling out license plate numbers associated with the vehicles parked outside the house. His average speed between those two points then was either 14.25 or 28.5 miles per hour, depending on his exact arrival time. In contrast, Robertson traveled about 6.4 miles to the burglary site in seven minutes, making his average speed about 54.86 miles per hour.

After Brankel arrived at the house, he helped secure the scene by taking suspects into custody.

At 10:33 p.m., a motorist named Dave Kessler ("Kessler") called 911 and reported seeing a body lying in the middle of Highway 17 in front of Rice's Cleaners while he was driving northbound. The same minute, another man named Michael Focke ("Focke") called 911 to report a body on the side of Highway 17. A third individual, Armin Yaris ("Yaris"), later reported that around that same time, he saw a white sports utility vehicle parked near Rice's Cleaners where the body was found.

Sergeant Mark Hedrick ("Hedrick") of the Missouri State Highway Patrol was already on his way to Rice's Cleaners in response to Brankel's earlier request for another agency to check on the woman walking in the road. When Hedrick arrived at 10:35 p.m., the first on the scene, he found the woman unconscious. Because the site was within Waynesville city limits, Hedrick requested a Waynesville Police Department officer at the scene.

The communications center twice asked Brankel to leave the burglary scene to assist Hedrick. Brankel refused both times, saying he had not finished work at the burglary site.

Robertson took off for the Highway 17 site first; Brankel followed suit about twenty minutes later.

On his way, Robertson learned from the dispatcher that the woman had died. When Brankel arrived at the scene, Robertson briefed him on the situation and told him the woman had been transported to the hospital. Brankel left for the hospital to speak with the coroner and to collect evidence. Staying behind, Robertson and Hedrick photographed the scene and searched the surrounding area for evidence. They took thirteen photographs and collected a strand of blonde hair and a piece of white plastic that might have come from an automobile.

Assistant Waynesville Police Department Chief Liberty arrived on the scene. Liberty and Robertson canvassed the surrounding area but were unable to find eyewitnesses. They spoke with five nearby residents, none of whom provided useful leads. Robertson and Hedrick also spoke with Kessler and Focke, but did not learn any new information.

At the hospital, the hit-and-run victim had been identified as Rhonda West. Brankel took thirty photographs of West. Hospital staff gave him West's clothing, jewelry, and false teeth. Brankel left the hospital for the police station, where he gave West's personal effects to Robertson. No additional, relevant investigation was done that night.

The next morning, Brankel and Robertson returned to Rice's Cleaners and thoroughly searched the scene. They went to where West had last been seen and walked up to where her body was found. They spoke to more witnesses, but found no new evidence. This was the last time the Waynesville Police Department investigated the scene where West was struck.

That day, Robertson filed an official criminal report in the department's electronic records management system. The only evidence he listed in his report was the strand of hair, piece of plastic, and the thirteen photographs taken at the scene. The report did not mention

West's clothing, jewelry, or false teeth or the thirty photographs Brankel took of her body. Brankel's photographs were not included anywhere in the case file.

The Waynesville Police Department did not save any of the non-photographic property associated with this case. West's false teeth were given to Ruby Sandusky ("Sandusky"), West's sister and Plaintiff's aunt. West's jewelry was last possessed by Robertson, but never given to West's family. Her jewelry then went missing. West's clothes, which were wet when initially collected by the emergency medical technicians, had become moldy and odorous. Although Police Chief Carter knew that the clothes might have evidentiary value, for example paint transferred from the striking vehicle, he ordered an officer to dispose of the clothes. Finally, the strand of hair and piece of plastic that were found on the roadway simply went missing.

Brankel, the department's evidence custodian, did not investigate why this property was not entered into evidence. Carter also never investigated where those items went, even though Carter knew of no other instance in which evidence possessed by the Waynesville Police Department had gone completely missing.

Around this time, the forensic pathologist who performed West's autopsy concluded the cause of death was disruption of the brainstem due to blunt trauma to the head, neck, and chest. He later agreed that West's injuries were consistent with being hit with an object about the size of a driver's side mirror. To him, West's wounds indicate that she was walking northbound on Highway 17, heard a vehicle coming from behind, and turned her head. The vehicle, traveling northbound, then could have struck her with its driver's side external rear-view mirror and thrown her in a northward direction.

Plaintiff's expert later inspected Brankel's vehicle and found evidence of repairs to the driver's side door. He found a grease pencil mark visible upon collapsing the mirror indicating it

had been repaired, fixed, or adjusted. The expert noted a moon-shaped crack to the lower left portion of the windshield consistent with stress.

At some point, Carter heard a rumor that West may have been struck by an emergency responder's vehicle. Carter checked Brankel's service vehicle for damage consistent with striking a large object like a human body. Carter did not see damage, but did not check the collapsible mirror closely.

Brankel was assigned to lead the investigation, serve as the point of contact for any leads, and keep West's family informed of the investigation's progress. Since being assigned, Brankel did not do anything else to investigate West's death. For instance, he never interviewed the three drivers who called 911 about West's body and never secured evidence or records from Hedrick at the Missouri State Highway Patrol. Carter did not direct anybody to do any additional investigation and did not perform any further investigation himself. The case went cold.

West's family grew impatient for updates. For about two years after West's death, her family contacted the Waynesville Police Department once or twice per month about the case. Sandusky asked Brankel for updates, but each time Brankel apologized and told her he had no new information to give. Sandusky brought up the case to Hedrick, but he had nothing to report to her. Plaintiff asked Sandusky to check with Carter, an old friend of the family, for progress on the case. Sandusky visited Carter at least five times in person for case updates and information on leads. During this time, no developing information was relayed to her.

West's family had also begun hearing rumors that law enforcement may have been involved in West's death. Sandusky suspected Brankel in particular after she witnessed him crying at West's funeral. Sandusky approached Carter with this rumor. Carter assured her that absolutely nobody in his department killed West. He told Sandusky she did not need to retain a

lawyer.  He told her to trust him and reminded her that he was a family friend who would not act in any way against the family's best interests.

One day in 2012, Sandusky visited the police station and met Sergeant Steven Lawhead ("Sergeant Lawhead").  Sergeant Lawhead told her he would look into the case and that she should return in a few days.  Upon her return, Sergeant Lawhead told Sandusky that he would not give her this file but that she could instead request them from the department administrator.

A few days after this conversation, Sandusky contacted Carter and confronted him again with her belief that Brankel had something to do with the death of her sister.  Carter stated that his officers were not involved and that the case was not closed.  Sandusky asked for all of West's files.  Carter gave her a copy of the criminal death investigation report and a copy of the toxicology report from the autopsy: the entirety of Robertson's original police report minus the thirteen crime scene photographs.  Carter did not provide Sandusky with the autopsy report or tell her he had one.

Sandusky shared all of this information with Plaintiff.  Neither Sandusky nor Plaintiff made further attempts to speak with Carter or any other Waynesville Police Department officer about West's death.

After meeting Sandusky and doing a preliminary investigation, Sergeant Lawhead learned that, contrary to what Carter told Sandusky, the case had been officially closed.  Sergeant Lawhead concluded that Brankel was responsible for West's death.  He ran his case theory by four other officers before feeling confident enough to approach Liberty, the assistant chief of police, for permission to investigate the case.  Liberty told him that Liberty had to first talk to Carter, which he did.  Liberty told Sergeant Lawhead that Carter did not want to talk to Sergeant Lawhead about the case and that Carter required new or additional evidence to do further

investigation. Sergeant Lawhead did not interpret Carter's response as an order to cease any investigation into the case. Sergeant Lawhead at this point believed Liberty was covering up details of West's death. He assigned himself the investigation.

Although Sergeant Lawhead believed there was a cover-up, he never forwarded his suspicions outside the department until February 4, 2013, just days after the three-year statute of limitations ran for Plaintiff to file a wrongful death claim. *See* Mo. Rev. Stat. § 537.100 (statute of limitations).[2] On that day, Sergeant Lawhead filed a probable cause statement against Brankel implicating him in West's death. In his statement, Sergeant Lawhead stated his belief that Brankel had committed the crimes of involuntary manslaughter and tampering with evidence.

The county prosecutor's office learned about the allegations and the probable cause statement. The office declined to file charges, but wrote to the Missouri State Highway Patrol requesting an independent investigation. Corporal Scott Mertens ("Corporal Mertens") with the Highway Patrol opened an investigation on March 22, 2013. He later concluded that based on the available evidence, there was insufficient probable cause to bring criminal charges against Brankel for striking West.

Plaintiff filed this lawsuit on May 9, 2013, before Corporal Mertens concluded his investigation. The complaint alleges that Brankel caused West's death and that Brankel, Robertson, Liberty, and Carter each conspired to cover up his role. Because the cover-up prevented Plaintiff from discovering the extent of Brankel's involvement until she could no longer file a timely wrongful death lawsuit, the complaint argues, each Defendant violated Plaintiff's constitutional right to seek redress in the courts.

The complaint names the City as a defendant on the theory that Carter had such extensive policymaking authority that his actions are imputable to the City. The sources of policy

---

[2] Plaintiff concedes the statute of limitations has run on this claim.

governing the Police Department are City ordinances, the City-wide personnel policy, and the Police Department-specific policy manual. Any policy changes or additions made by Carter had to be reviewed by the city administrator and the city attorney, unless they were very minor, like employee parking arrangements and policies regarding employee smoke breaks. If Carter proposed a new policy but the reviewing officials opposed it, then the policy would not go into effect. Carter did have final decision-making authority regarding investigations of cases of the Waynesville Police Department. For instance, he was authorized to order the disposal of West's wet clothing.

## Standard

Defendants now move for summary judgment under Federal Rule of Civil Procedure 56. A moving party is entitled to summary judgment on all or part of a claim if he "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law," and a genuine dispute over a material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether a jury question presents on an element, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in her favor. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

## Analysis

All five Defendants move for summary judgment on the only count in the complaint, a claim brought under 42 U.S.C. § 1983. Section 1983 creates a private cause of action for the violation of federal rights by an official acting under color of state law. *Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014). Plaintiff claims Defendants violated

§ 1983 and denied her access to the courts by covering up physical evidence and information and by lobbying Plaintiff to trust the Police Department's handling of the investigation and not to obtain legal advice.[3]

Liability under § 1983 is personal, so a court must independently assess each defendant's conduct. *Heartland Acad. Cmty. Church v. Waddle*, 595 F.3d 798, 805–06 (8th Cir. 2010). Plaintiff sets forth and controverts various facts related to Robertson, but her brief in opposition makes no legal argument as to why summary judgment in his favor is inappropriate. She has thus waived any arguments in opposition to summary judgment in favor of Robertson. *See Mark v. Ault*, 498 F.3d 775, 786 (8th Cir. 2007) (inferring abandonment from a party's failure to address an issue in a brief). The Court GRANTS summary judgment to Robertson.

At the same time, Defendants' brief discusses facts involving Liberty, but makes no legal argument explaining why summary judgment should be granted in his favor. As Liberty has failed to "show[] that . . . [he] is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), the Court DENIES summary judgment to Liberty.

Thus remains Brankel, Carter, and the City. Brankel and Carter assert the affirmative defense of qualified immunity; in the alternative, they argue they are entitled to summary judgment on the merits of Plaintiff's claim. Insofar as Brankel and Carter are liable, the City, their employer, asserts that under the *Monell* doctrine it is not liable for their actions. The Court addresses each argument in turn.

---

[3] Defendants' motion addresses a possible second claim, for a § 1983 conspiracy. *See White v. McKinley*, 519 F.3d 806, 815–16 (8th Cir. 2005) (finding § 1983 conspiracies to be actionable). The complaint here does not clearly state a second claim against Defendants. *See Johnson v. City of Shelby*, 135 S. Ct. 346 (2014) (per curiam) (holding a complaint need not cite § 1983 to state a § 1983 claim). Because Plaintiff's main § 1983 claim alleges a general conspiracy in the lay sense of the word, and because the record does not demonstrate that Plaintiff has been pursuing a separate § 1983 conspiracy claim, the Court holds that any § 1983 "conspiracy" is encompassed by the § 1983 overt act claim. Even if the Court were to read these claims as distinct, the Court would grant summary judgment to Defendants on the conspiracy claim because Plaintiff fails to rebut their arguments or otherwise show that there is a genuine issue of a material fact on a § 1983 conspiracy claim. *See Mark v. Ault*, 498 F.3d 775, 786 (8th Cir. 2007).

## I. The Court denies qualified immunity to Brankel and Carter.

The Court first determines whether Brankel and Carter have immunity to this lawsuit under the doctrine of qualified immunity. A government official sued under § 1983 is entitled to qualified immunity if "no reasonable factfinder could determine that (1) the facts viewed in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right, and (2) the constitutional right was clearly established at the time of the deprivation so that a reasonable officer would understand his conduct was unlawful." *S.L. ex rel. Lenderman v. St. Louis Metro. Police Dep't Bd. of Police Comm'rs*, 725 F.3d 843, 850 (8th Cir. 2013) (internal quotation marks omitted).

### A. There is no genuine dispute over whether Brankel and Carter violated Plaintiff's constitutional right to access the courts.

The first issue for qualified immunity is whether Brankel and Carter violated Plaintiff's constitutional right to access the courts. The Constitution protects every citizen's right to seek redress in the courts. *Christopher v. Harbury*, 536 U.S. 403, 413–15 (2002). "This right applies not only to the actual denial of access to the courts, but also to situations in which the plaintiff has been denied meaningful access by some impediment put up by the defendant." *Scheeler v. City of St. Cloud*, 402 F.3d 826, 830 (8th Cir. 2005). Section 1983 provides a remedy for an individual who has been denied access to the courts. *E.g. id.*

To establish a claim that a government official violated the plaintiff's constitutional right to access the courts, the plaintiff must make three showings. First, the plaintiff must have a viable cause of action that she could have raised but for the government official's obstructive actions. *Harbury*, 536 U.S. at 415–16.[4] Second, a state actor must have obstructed the plaintiff

---

[4] *Harbury* appears to further require the plaintiff to plead that the underlying claim seeks "relief obtainable in no other suit in the future." 563 U.S. at 414. However, the Eighth Circuit does not appear to enforce this element. *Compare Lenderman*, 725 F.3d at 851 & n.4 (majority opinion), *with id.* at 856–57 (Gruender, J., dissenting).

from meaningfully accessing the courts. *Id.* at 413–14. Third, the state actor must have acted recklessly or intentionally. *Scheeler*, 402 F.3d at 830–31. Brankel and Carter carry the burden of establishing this affirmative defense, which they can do by demonstrating that Plaintiff's claim fails on one or more of these elements. *See Smith v. City of Minneapolis*, 754 F.3d 541, 546 (8th Cir. 2014).

### 1. Plaintiff has established a viable underlying claim.

Plaintiff must first establish that she has an underlying claim that would have been viable but for the obstruction of court access. A plaintiff alleging denial of access to the courts must "state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued," and then prove the claim. *Harbury*, 536 U.S. at 417–18. Plaintiff's underlying claim is for wrongful death under Missouri law. To prove a wrongful death case under Missouri law, a plaintiff must show that the negligence of the defendant directly caused the death. *Graham v. Ozark Mountain Sightseeing, Inc.*, 181 F.3d 924, 926 (8th Cir. 1999) (citing *Morton v. Mutchnick*, 904 S.W.2d 14, 16 (Mo. Ct. App. 1995)).

A reasonable jury, viewing the facts in the light most favorable to Plaintiff, could find Brankel struck and killed West. He is the last person known to see her conscious, and he was alone when he did so. West's wounds match the height and size of the mirror on Brankel's vehicle. His vehicle later showed a small crack on the windshield and signs of repairs performed on the mirror. Between when she was last seen and when she was found, Brankel was unaccounted for, a period during which he drove significantly slower than Robertson did (14.25 miles per hour compared to Robertson's 54.86 miles per hour), despite the fact that his dispatcher had ordered him to expedite his arrival. This would provide Brankel enough time to strike West, stop, dispose of evidence at the scene, readjust his mirror, and proceed to the burglary site. Yaris, the eyewitness, saw a white sports utility vehicle consistent in appearance

with Brankel's service vehicle parked near where West's body was found. Finally, Brankel resisted leaving the burglary site to return to the body, giving him more time to check his vehicle for incriminating evidence.

Although Corporal Mertens later concluded that these facts were insufficient to sustain a criminal action against Brankel, the burden of proof is higher for criminal prosecutions than for civil lawsuits. *Compare generally* Mo. Rev. Stat. § 565.024.1 (criminal involuntary manslaughter statute) *and id.* § 575.100 (criminal tampering with physical evidence statute), *with id.* § 537.080.1 (less stringent civil wrongful death statute). The investigative mandate before Corporal Mertens was not to determine whether Brankel's culpability could be proved by a preponderance of the evidence, which is the burden Plaintiff would have faced if she had been able to pursue civil litigation. Corporal Mertens's conclusion thus does not resolve this inquiry.

Finally, a reasonable juror could circumstantially find that by driving at an initially high rate of speed and failing to avoid a woman walking in the road, Brankel acted negligently. Plaintiff has made a submissible case on the first element of her claim.

### 2. Brankel and Carter reasonably could have obstructed Plaintiff from meaningfully accessing the courts.

The second element of this claim asks whether Brankel and Carter obstructed Plaintiff from accessing the courts to bring her wrongful death claim. What constitutes obstructive action is fact-intensive and context-specific. The Seventh Circuit has distinguished between police malfeasance, such as a police evidentiary cover-up, and mere misfeasance or nonfeasance, "where a plaintiff simply alleges that law officers were lax in their investigatory duties." *Bell v. City of Milwaukee*, 746 F.2d 1205, 1261–64 (7th Cir. 1984) (upholding a denial-of-access judgment for plaintiffs where two police officers recklessly committed a murder, then "did everything in their power to cover up and conceal the facts within their sole control," which

"shield[ed] from the public and victim's family key facts which would form the basis of the family's claims for redress"). Malfeasance can support a denial of access-claim; misfeasance and nonfeasance do not. *See id.*; *see also Ryland v. Shapiro*, 708 F.2d 967, 974–75 (5th Cir. 1983) (holding a complaint stated a viable denial-of-access claim where it alleged that a local prosecutor murdered a woman and conspired with the defendants to cover up the murder for eleven months, thereby preventing the decedent's family from bringing a wrongful death action against the prosecutor).

In contrast, there is no denial of access if the cover-up is exposed in time for the plaintiff to seek redress. *Vasquez v. Hernandez*, 60 F.3d 325, 328–29 (7th Cir. 1995). Nor has meaningful access been denied where the plaintiff knows who the alleged perpetrators are before the statute of limitations for a wrongful death lawsuit expires. *Chappell v. Rich*, 340 F.3d 1279, 1283–84 (11th Cir. 2003) (per curiam) ("Although access to the concealed evidence might have strengthened their case, the Chappell children do not allege that they were or would have been prevented from filing a wrongful death suit within the statute of limitations period, nor that the Defendants' actions would have made such a suit inadequate, ineffective, or not meaningful."); *Wilson v. Meeks*, 52 F.3d 1547, 1557 (10th Cir. 1995) (distinguishing between "interference with discovery and interference with the filing of the complaint" and assuming that at most, the latter alone supports a denial-of-access claim); *see also* Martin A. Schwartz, *Section 1983 Litigation: Claims and Defenses* § 3.24[B][2] (4th ed. Supp. 2014) (collecting cases).

Defendants argue that a plaintiff cannot establish that her access to the courts was obstructed if she never tried to file a lawsuit in the first place, but that does not appear to be the rule in the Eighth Circuit. *Compare Swekel v. City of River Rouge*, 119 F.3d 1259, 1264 (6th Cir. 1997) (in a case predating *Harbury*, affirming a grant of summary judgment in defendants'

favor because "[b]efore filing an 'access to courts' claim, a plaintiff must make some attempt to gain access to the courts" but the plaintiff there had never "even attempted to go to the state court in first instance"), *with Lenderman*, 725 F.3d at 845–48 (affirming a denial of qualified immunity in a case where the plaintiff had never attempted to file a lawsuit before she brought denial-of-access claims).

With these guideposts in mind, the Court turns to the facts of this case. To start, a reasonable jury, viewing the facts in the light most favorable to Plaintiff, could find that Brankel helped deny Plaintiff access to the courts by concealing evidence and impeding the investigation into her mother's death. Brankel potentially minimized or destroyed the evidence available for later investigators like Sergeant Lawhead to use to solve the crime. He did not attach his thirty photos of West to the electronic records system or add them to the case file. He could also have used his position as the Police Department's evidence custodian to make certain potentially inculpatory evidence go missing. For example, the Police Department cannot locate West's false teeth and jewelry, which might have been scuffed by the vehicle that struck her.

Brankel also kept the investigation from advancing. Brankel never followed up on the collected evidence such as the hair, piece of plastic, his photographs, or his own vehicle. He did not interview Yaris, Focke, or Kessler. He was in charge of the investigation, yet did no further work on the investigation after February 1, 2010. A reasonable jury could find Brankel did no work on the case in order to conceal his involvement.

Carter, too, impeded a proper investigation. Carter heard a rumor that Brankel struck West, and had access to the above evidence tending to establish Brankel's complicity. Regardless, Carter did not conduct an investigation in the manner described above or direct an officer besides Brankel to lead, or even participate in, the investigation. For instance, Carter

15

inspected Brankel's vehicle, but he did not look past the front of the car. He also ordered West's clothing destroyed even though that clothing could have potentially yielded clues.

Carter resisted reopening the West investigation and told Sergeant Lawhead not to do so. He officially closed the case, but told Sandusky the case was still open. He did not give Sandusky all of the Department's files on the West case. He plausibly did so because he did not want the family to discover Brankel's involvement.

Finally, on several occasions Carter assured Sandusky, West's sister and Plaintiff's aunt, that she should trust him. Although Plaintiff may have *suspected* Brankel was involved before Sergeant Lawhead filed his probable cause statement, Brankel and Carter's assurances effectively neutralized her suspicions and left her with no good reason to believe Brankel was actually involved. *Cf. Chappell*, 340 F.3d at 1283–84 (holding there was no denial of access where family members knew before the expiration of the statute of limitations that the defendant had been criminally investigated for the underlying crime). Carter reminded her that he was a family friend and told her that he would not do anything against the family. He pointedly assured her that absolutely nobody in the Department was involved in West's death. Carter urged Sandusky not to retain an attorney. When Sandusky eventually asked for the entire case file, Carter did not give it all to her. Because Sandusky worked in close concert with Plaintiff, Carter's actions toward Sandusky harmed Plaintiff as well.

By covering up Brankel's potential culpability in the manner described above, Brankel and Carter withheld information from the Waynesville Police Department that the Police Department could have used to properly investigate West's death before its three-year anniversary. Had the Police Department been able to do so, then it would have had case updates to give West's family. Plaintiff would then have had the same facts later assembled by Sergeant

16

Lawhead and cited in support of his probable cause statement: facts necessary to maintain a timely wrongful death lawsuit against Brankel. Therefore, Brankel and Carter effectively prevented Plaintiff from seeking redress in court.

Defendants portray this case as a group of police officers carelessly losing track of evidence and negligently failing to pursue leads: a sloppy investigation, but not a constitutional violation. A reasonable jury, viewing the evidence against Plaintiff, might agree and reach the same conclusion as Corporal Mertens. But that is not the standard at summary judgment. A reasonable jury, viewing the evidence in the light most favorable to Plaintiff, could reach the same conclusion as Sergeant Lawhead. *See also Bell*, 746 F.2d at 1261–64 (holding that very similar facts supported a finding of liability); *Ryland*, 708 F.2d at 974–75 (same). Because a jury could find Brankel and Carter obstructed Plaintiff from accessing the courts, these Defendants fail to show Plaintiff cannot succeed on her second element.

### 3. A reasonable jury could conclude Brankel's and Carter's actions shock the conscience.

The final element of a denial-of-access claim concerns the defendant's state of mind. The parties dispute exactly what state of mind a denial-of-access defendant must have had.

The right to access the courts emanates from several constitutional provisions, including the First Amendment right to petition the government for a redress of grievances and the Fourteenth Amendment right to due process of law. In cases drawing upon the First Amendment, the plaintiff "must show that the defendants acted with some intentional motivation to restrict their access to the courts." *Scheeler*, 402 F.3d at 830. In contrast, a plaintiff alleging a violation of the Fourteenth Amendment need only show that the government official's conduct was so egregious that it shocks the conscience. *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 956 (8th Cir. 2001). In the context of denial-of-access claims, an official meets this standard if his

actions were subjectively reckless, *id.* at 957 & n.9, meaning he exhibited deliberate indifference toward the individual's rights. *Scheeler*, 402 F.3d at 831.

The Eighth Circuit has not definitively decided which standard applies to denial-of-access claims. *See, e.g.*, *id.* at 830–32 (analyzing a denial-of-access claim under both Amendments in the alternative but holding that the facts satisfied neither standard). Although the Eighth Circuit has sometimes applied the First Amendment standard in denial-of-access claims, it has never done so in the context of misfeasance in a police investigation. *See, e.g.*, *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1427–28 (8th Cir. 1986) (applying the First Amendment to a claim that the defendants conspired to force the plaintiffs to settle a lawsuit and sell their property to the defendants by filing a frivolous condemnation counterclaim). *But cf. Lenderman*, 725 F.3d at 850–51 (in a case involving the concealment of the involvement of certain officers involved in a false arrest, assuming without discussion that the First Amendment supplied the relevant standard). In contrast, the cases that involve allegations that police failed to properly investigate a potential crime scene, like this one, have applied the Fourteenth Amendment. *See Wilson*, 260 F.3d at 956 (applying the Fourteenth Amendment to a § 1983 claim that officers failed to investigate potential leads in a homicide case, resulting in the plaintiff's wrongful imprisonment);[5] *cf. Scheeler*, 402 F.3d at 831 (finding that the Fourteenth Amendment at least arguably applied to a claim of failure to properly investigate a potential crime scene). Because the applicable standard in these cases appears to depend on the factual context, not the right allegedly being violated, the Court applies the Fourteenth Amendment here. *See also Bell*, 746 F.2d at 1261 (in the Seventh Circuit, applying

---

[5] Although *Wilson* did not involve a denial-of-access claim, the Eighth Circuit has found *Wilson* to be "a useful analogue" in a denial-of-access case. *Scheeler*, 402 F.3d at 831.

the Fourteenth Amendment to a claim involving police conspiracies to obfuscate investigations and conceal the perpetrators' identity).

Here, Brankel's and Carter's actions were indeed reckless and deliberately indifferent toward Plaintiff's due process rights. The evidence suggests not just nonfeasance or misfeasance, but malfeasance. Assuming Brankel caused West's death, he also knew or should have known that he would face criminal prosecution and a civil lawsuit. Despite so knowing, Brankel undertook many covert actions to conceal his role in the death including destroying evidence.

Carter knew that Brankel was the prime suspect and nevertheless made him responsible for the investigation. Carter also affirmatively misled West's family into thinking the investigation had no leads and told them that he would inform them when he had any new information on the case. He told Liberty that Sergeant Lawhead had not shown a good enough reason to reopen the investigation. Carter also did not look into the very unusual circumstances surrounding the loss of physical evidence. The entire time, Carter knew or should have known that his actions would likely subject him to a civil lawsuit.

On balance, a reasonable jury could find that Brankel and Carter acted deliberately indifferent toward Plaintiff's right to seek redress in the courts for what happened to her mother. They thus demonstrated a subjectively reckless, if not intentional, abuse of power that is sufficiently egregious to distinguish this case from others finding no deliberate indifference. *See, e.g.*, *Scheeler*, 402 F.3d at 831–32 & n.3 (holding that police defendants were not reckless in allegedly mishandling a death investigation where the police photographed and preserved most evidence, asked outside agencies for independent evaluations, reopened the investigation when the decedent's family asked the department to do so, and were not alleged to have caused the

death at issue).  Therefore, Brankel and Carter fail to show Plaintiff cannot succeed on the third element of her claim.

In all, there is a genuine dispute over whether Brankel and Carter violated Plaintiff's constitutional right.  Defendants fail to carry their burden of establishing qualified immunity on the first prong.

### B.  Plaintiff's right was clearly established at the time Brankel and Carter deprived her of it.

The second part of a qualified immunity analysis examines whether the constitutional right violated was clearly established at the time of the misfeasance.  *See Lenderman*, 725 F.3d at 850.  A government official violates a clearly established right when "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014).  "In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate."  *Id.* (internal quotation marks omitted).  However, the court need not find a precedent directly on point, because "[t]he unconstitutionality of outrageous conduct obviously will be unconstitutional, [so] '[t]he easiest cases don't even arise.'"  *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (quoting *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 854 (7th Cir. 1990) (Posner, J.)) (third alteration in original).  A court must still define the right at a sufficiently specific level, lest it elide "the crucial question [of] whether the official acted reasonably in the particular circumstances that he or she faced."  *Plumhoff*, 134 S. Ct. at 2023.

Here, the relevant constitutional right is the right to access the courts free from an evidentiary cover-up by law enforcement.  The determinative issue is whether that right was "clearly established" as of January 31, 2010, when West died and the cover-up allegedly began.

20

The Eighth Circuit has suggested that "intentional" police misconduct "ar[ising] from a conspiracy" would violate a plaintiff's clearly established constitutional rights.  *Mettler v. Whitledge*, 165 F.3d 1197, 1206 (8th Cir. 1999); *see also Edwards v. Baer*, 863 F.2d 606, 607 (8th Cir. 1988) (noting that the purpose of qualified immunity is "to excuse an officer who makes a reasonable mistake in the exercise of his official duties," not an officer who "intentionally abused a person's known rights").  For example, by the late 1990s grandparents had a clearly established right against denial of access to the courts by state social workers that intentionally failed to initiate juvenile court proceedings wherein grandparents could intervene in and obtain custody of their grandson.  *Whisman ex rel. Whisman v. Rinehart*, 119 F.3d 1303, 1313 (8th Cir. 1997).  And, again, the Fifth and Seventh Circuits have held since the 1980s that "a conspiracy to cover up a killing, thereby obstructing legitimate efforts to vindicate the killing through judicial redress," could amount to a constitutional violation.  *Bell*, 746 F.2d at 1215–17; *accord Ryland*, 708 F.2d at 974–75; *cf. Lynch v. Barrett*, 703 F.3d 1153, 1157, 1160–63 (10th Cir. 2013) (holding that under Tenth Circuit precedent, a right against a police evidentiary cover-up was not clearly established when it merely prevented the plaintiff from conducting effective discovery, but not from filing a complaint in the first place); *see also Turner v. Ark. Ins. Dep't*, 297 F.3d 751, 755 (8th Cir. 2002) (permitting a court to look at decisions arising outside the Eighth Circuit to determine whether a constitutional right is clearly established).

The Court finds that Plaintiff's right was clearly established as of January 31, 2010.  A reasonable officer would have known from Eighth Circuit precedent that a conspiracy to cover-up evidence of a homicide violates the Fourteenth Amendment.  *See Mettler*, 165 F.3d at 1206.  It was clearly established at all relevant times that government officials cannot conspire to delay judicial proceedings in order to thwart a custody battle.  *See Whisman*, 119 F.3d at 1313.  And if

a police officer knew he could not conspire to obstruct court access when child custody is at stake, then he certainly should have known that he could not conspire to obstruct court access to cover up a homicide involving an officer of the same department. *Mettler* and *Whisman* "therefore gave fair warning to [Brankel and Carter] that their conduct crossed the line of what is constitutionally permissible." *Hope v. Pelzer*, 536 U.S. 730, 743 (2002); *see also Bell*, 746 F.2d at 1215–17; *Ryland*, 708 F.2d at 974–75; *cf. Lynch*, 703 F.3d at 1162–63.

Even if the Eighth Circuit had not pronounced this rule for police officers, the Court would still find this to be one of the obvious cases that does not need to have previously arisen to show the right was clearly established. *See Safford*, 557 U.S. at 377; *K.H.*, 914 F.2d at 851. Common sense alone should inform a reasonable police officer that using his position of authority to cover up police involvement in a citizen's death for so long that they have effectively given themselves immunity from civil liability is a wrong of constitutional magnitude. A reasonable police officer would abide by this presumption even if he does not know exactly which of the decedent's family members might want to file a lawsuit, or whether the decedent has family members at all. Qualified immunity cannot reward such an "intentional[] abuse[ of] a person's known rights." *Edwards*, 863 F.2d at 607.

Therefore, a reasonable police officer would know in 2010 that conspiring to tamper with a homicide investigation and intentionally concealing a fellow officer's role in that investigation, with the effect of precluding judicial redress for the victim's family, violated the Fourteenth Amendment. Accordingly, the right Brankel and Carter allegedly violated was, at the time, clearly established. Brankel's and Carter's claims for qualified immunity fail on the second prong.

Brankel's and Carter's claims of qualified immunity are denied.

## II. Summary judgment is denied to Brankel and Carter.

Having dispensed with qualified immunity, the Court proceeds to the merits of Plaintiff's § 1983 claim and decides whether to grant summary judgment to Brankel and Carter. To establish a violation of § 1983, a plaintiff must prove: "(1) the violation of a constitutional right, (2) committed by a state actor, (3) acting with the requisite culpability and causation to violate the constitutional right." *Cox v. Sugg*, 484 F.3d 1062, 1066 (8th Cir. 2007).

The foregoing discussion on qualified immunity demonstrates how Plaintiff has shown a genuine dispute over facts material to all three elements. Brankel and Carter allegedly violated Plaintiff's constitutional right by covering up Brankel's role in West's death and by urging her family not to retain a lawyer. Brankel and Carter concede they are state actors. And but for Brankel's and Carter's tactics, another officer like Sergeant Lawhead could have discovered Brankel's involvement much earlier and released that information to Plaintiff or the public, thus allowing Plaintiff to timely file her suit. Because a reasonable factfinder could conclude that Brankel and Carter violated § 1983, the Court DENIES them summary judgment on this claim.

## III. Because Carter lacked the authority to set department policy, there can be no *Monell* liability and summary judgment is granted to the City.

Finally, the City moves for summary judgment on that ground that Plaintiff has failed to allege a cognizable claim for municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Governmental entities are liable under § 1983 for the alleged conduct of their employees only "when execution of a government's policy or custom" causes the constitutional deprivation. *Monell*, 436 U.S. at 694. Plaintiff does not argue that a City *custom* animated Brankel's and Carter's cover-up, so the Court examines only whether a City *policy* caused her constitutional deprivation.

To establish *Monell* liability for a government policy, a plaintiff must prove that a state agent acted pursuant to official municipal policy. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011). Official municipal policy may be inferred from a single decision taken by the most senior official responsible for setting policy in that area of the city's business. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion).

The only Defendant alleged to set policy for the City is Police Chief Carter, so the question here is whether Carter had final policymaking authority in the area of law enforcement such that his decisions and actions could create municipal policy imputable to the City. Whether an individual has final policymaking authority such that his actions could create imputable municipal policy is a question of state law. *Id.* at 124. Under Missouri law, the police chief of a fourth-class city is not a final policymaker. *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1215 (8th Cir. 2013) (citing Mo. Rev. Stat. § 79.110).[6] However, even if a police chief does not have formal policymaking authority, he nevertheless may have informal policymaking authority that carries the force of law. *Id.* at 1215.

Here, Carter did not have informal policymaking authority that carried the force of law. City ordinances, a generally applicable personnel policy, and the police policy manual were the sources of policy governing the Department. Any policy changes or additions made by Carter had to be reviewed by the city administrator and the city attorney unless they were very minor, like police parking arrangements or employee smoke break protocol. If he proposed a new policy but the reviewing city officials opposed it, then the policy would not go into effect. Because of this veto power, City officials, not Carter, were the most senior officials responsible for setting police department policy.

---

[6] Whereas the city-defendant in *Atkinson* was a fourth-class city, 709 F.3d at 1215, here the City of Waynesville is alleged to be a third-class city. No party argues the distinction is significant. *See also* Mo. Rev. Stat. §§ 72.030, 72.040.1 (primarily using population size to distinguish between third- and fourth-class cities).

Any authority exercised by Carter extended only to investigative decisions, like whether to destroy West's clothes, but not to investigative policies. Final decision-making authority over investigative issues is not tantamount to final policymaking authority that carries the force of law. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–84 (1986) ("The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion."). Carter's decisions, then, cannot be imputed to the municipality for purposes of *Monell* liability. *See Praprotnik*, 485 U.S. at 124.

Because no reasonable juror could find that Carter had the authority to make policy that carries the force of law, there is no genuine dispute over any facts material to this claim. Summary judgment is GRANTED to the City.

## Conclusion

Defendants' Motion for Summary Judgment (Doc. 63) is GRANTED IN PART and DENIED IN PART. Summary judgment is granted to Defendants Brandon Robertson and the City of Waynesville. Summary judgment is denied to Defendants Gary Brankel, Robert Carter, and Clarence Liberty. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

Date:  January 16, 2015                    /s/ Greg Kays
                                           GREG KAYS, CHIEF JUDGE
                                           UNITED STATES DISTRICT COURT